Filed 7/16/15  Lesh v. Llewellyn Properties CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DARLA LESH et al., as Trustees, etc., | B250364 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC476163) |
| v. | |
| LLEWELLYN PROPERTIES, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Reversed with directions.

Wilton & Associates and Ronald D. Wilton for Plaintiffs and Appellants.

Hennelly & Grossfeld, Michael G. King and Ryan R. Jike for Defendant and Respondent Llewellyn Properties, LLC.

Fidelity National Law Group and Kevin R. Broersma for Defendant and Respondent Anchor Fund, LLC.

_____

This appeal involves competing claims to a single family residence located at 4616 South Van Ness Avenue, Los Angeles (the Property). The plaintiff successor trustees, Darla Lesh (Lesh) and Betty Wilton (Wilton) (plaintiffs), claim title through purchase of the Property in 1970 by their father, Edward Weiss (Weiss) in the name of Margaret Stensrudda (Stensrudda), as well as through their parents' and the Weiss Revocable Living Trust's (Trust)[1] possession of the Property until 2011, when defendant Llewellyn Properties, LLC (Llewellyn) purchased the Property. Plaintiffs concede that Weiss's acquisition of the Property was based on fraud because Margaret Stensrudda never existed; according to what Weiss told Lesh, he put the Property in Stensrudda's name so that he could buy it cheaper and earn a broker's commission. Llewellyn purchased the Property in 2011 through a grant deed that the parties acknowledged was forged.[2]

The trial court ruled in favor of Llewellyn on two grounds: (1) plaintiffs did not have standing to bring the claims herein and "no legal claim to ownership" because Weiss's statement to Lesh about his putting the Property in Stensrudda's name was inadmissible hearsay, "no public record calls into question the existence of Stensrudda," Lesh was not credible and the court did not credit the documents showing that Weiss or the Trust paid money into escrow at the time of purchase and the Property's expenses,

---

[1] In the original complaint, the Trust, which is a family trust, was the plaintiff. We take judicial notice of the superior court file in this case, which includes demurrers to the original complaint in which defendants argued that a trust cannot bring suit in its own name. A first amended complaint was subsequently filed naming Lesh and Wilton as successor trustees and plaintiffs, although the Trust is still listed as the plaintiff in the caption. Notwithstanding this procedural history, the opening brief names the Trust as the appellant and plaintiff below, and merely lists Lesh and Wilton as interested persons in the Certificate of Interested Entities or Persons. We observe that the notice of appeal in this case was filed in the names of the Trust, Lesh, and Wilton.

[2] Defendant Anchor Fund, LLC (Anchor), is the assignee of an assignment of deed of trust recorded on May 27, 2011, in favor of Anchor Loans, Inc., which had provided Llewellyn funding to purchase the Property. Llewellyn's owner, Ryan Nichols, personally guaranteed that loan. Anchor Loans was a defendant below but was dismissed prior to trial and is not a party to this appeal. The parties stipulated at trial that Anchor held the beneficial interest in the deed of trust that plaintiffs sought to cancel.

and rented out the Property; and (2) the equities did not favor plaintiffs because Weiss's fraud constituted unclean hands and Weiss's fraud and Lesh's failure to correct the public records caused the forgery to happen to Llewellyn's prejudice.

We disagree. The evidence of Weiss's and the Trust's possession of the Property gave rise to a rebuttable presumption of ownership under Evidence Code sections 637 and 638, thus giving plaintiffs standing to bring the claims herein and requiring defendants to come forward with evidence that Stensrudda was a real person, which they admitted at trial they could not. Third, Llewellyn cannot take good title through a forged deed and substantial evidence did not support the trial court's conclusion that Weiss's putting the Property in Stensrudda's name decades earlier caused or allowed the forgery to happen.

Although we do not condone Weiss's fraud and Lesh's failure to correct her father's transgression, for the reasons set forth below, we reverse the judgment and remand the case with directions to cancel the grant deed recorded on May 6, 2011, conveying the Property to Llewellyn Properties LLC and the assignment of deed of trust recorded on May 27, 2011; order defendants to deliver possession of the Property to plaintiffs; declare that plaintiffs have a fee simple interest in the property; and try the parties' competing claims for monetary relief, that is, plaintiffs' claims for money damages and defendants' offset defenses.

## PROCEDURAL AND FACTUAL BACKGROUND

### Summary of proceedings below

The Trust filed the original complaint on December 30, 2011, and plaintiffs filed the operative first amended complaint (FAC) on April 10, 2012.[3] The causes of action that survived by the time of trial were: cancellation of deed; quiet title; trespass (against Llewellyn only); ejectment (against Llewellyn only); and declaratory relief.[4] In their

---

[3] See *ante*, footnote 1.

[4] The trial court sustained a demurer to plaintiffs' cause of action for imposition of constructive trust.

3

prayer for relief, plaintiffs sought, among other relief, cancellation of Llewellyn's grant deed, cancellation of Anchor's assignment of deed of trust, general, special and punitive damages, including the reasonable value of rents and profits since Llewellyn bought the Property, delivery of possession of the Property, and a declaration and judgment "confirming Plaintiffs' fee simple interest in the Property."

In its first amended answer to the FAC, Llewellyn asserted, among other defenses, that it was a bona fide purchaser, plaintiffs lacked standing or capacity to sue, estoppel and waiver, unclean hands, unjust enrichment, damages caused by plaintiffs' negligence, fraud of a third party, set-off for good faith improvement under Code of Civil Procedure sections 741and 872.430, partition by sale, and equitable distribution of proceeds. Anchor's answer made similar claims.

The trial court conducted a bench trial on December 3 and December 4, 2012. As detailed below, at trial, plaintiffs proffered documentary evidence and the testimony of Lesh, the purported notary of Llewellyn's deed of trust, Albert Oviedo (Oviedo), Darren Wells (Wells), who had assisted Llewellyn in identifying the Property for investment, and Ryan Nichols (Nichols), Llewellyn's owner and manager. Llewellyn proffered Nichols's testimony as well as documents, including the public records indicating Stensrudda was the owner of the Property. The parties stipulated at trial that Margaret Stensrudda was not an "aka" of Edward Weiss.

After receiving the parties' posttrial briefs, on February 11, 2013, the trial court issued its proposed statement of decision in favor of Llewellyn and Anchor. Plaintiffs filed objections to the proposed statement of decision on February 25, 2013, which the court overruled on February 26, 2013. The court issued its final statement of decision on February 26, 2013.

On April 2, 2013, the court entered judgment in favor of Llewellyn and Anchor. The judgment recited that "Plaintiff Trust [*sic*] shall take nothing by way of its First Amended Complaint against Defendants"; declared that Llewellyn "held an interest in [the Property] as a fee simple owner, the basis of which is a Grant Deed that was recorded . . . on May 6, 2011" and that Anchor "held an interest in [the Property], the

4

basis of which is an Assignment of Deed of Trust that was recorded . . . on May 27, 2011"; and "Plaintiff Trust [*sic*] owns no right, title, estate, lien or interest in [the Property]." The court awarded Llewellyn costs in the amount of $7,309.78 and costs to Anchor according to proof.[5] Llewellyn gave notice of entry of judgment on June 4, 2013, and plaintiffs filed this appeal on July 31, 2013.

On June 2, 2015, pursuant to Government Code section 68081, we requested responses to the following question: "Was Weiss's statement to Lesh about Stensrudda and the subject real property admissible as a declaration against interest" under Evidence Code section 1230? We received the parties' timely responses.

**Evidence regarding the Trust's claim of ownership to the Property**

On August 14, 1970, the probate court approved sale of the Property by the Estate of Kay Kaumeyer to Margaret Stensrudda for $12,000 in cash. The probate court also approved payment of a $600 commission to Weiss, who was a licensed real estate broker. Weiss withdrew $10,885 from his own account on November 16, 1970, and obtained a cashier's check for $10,885 payable to the Estate of Kay Kaumeyer.

The escrow statement dated November 19, 1970, reflects a credit in that same amount and the statement recites that it was sent to "Margaret Stensrudda c/o Edward Weiss" at the same address of 1414 Vermont Avenue that Lesh testified was an office address for her parents' real estate business. A handwritten note on the customer copy of the cashier's check states that the monies came from Weiss's personal account at Security Pacific Bank and contains a handwritten escrow account number that is the same as the number on the escrow statement.

The grant deed recorded on November 19, 1970, lists Margaret Stensrudda as the grantee, and Kenneth B. Kober, executor of Kay Kaumeyer's estate, as the grantor. A "Statement of Information" apparently provided to the title insurance company recites that Margaret Stensrudda was born in Missouri in 1923 and lists addresses for her in Pacoima, California, New York, and 5750 West First Street in Los Angeles. It recites

_____

[5] Ultimately, the court awarded Anchor $3,602.73 in costs.

two dates, February 4, 1969, and October 15, 1970, near a signature for "Margaret Katrina Stensrudda."

Lesh and Wilton are Weiss's and his wife Beatrice's daughters. Edward and Beatrice died respectively in 2006 and 2009. Lesh is a graduate of UCLA and was a licensed real estate broker for "15, 20 years."

Lesh testified that Edward Weiss along with Beatrice owned and managed over 80 rental properties in his lifetime. Lesh first started working for her parents in that business in the late 1970's when she was 16 or 17, and began working for them full time after she graduated from college in the early 1980's. Her father taught her "the business," which she ultimately managed. She learned from her father, and later on was responsible for "what forms to use for rental purposes, for lease purposes," how to fill out rent cards, doing evictions, reconciling the Security Pacific Bank statements and later on statements from Bank of America, maintaining the properties, and paying the tax and other bills for the properties.

She testified at length about where the business records were stored, generally at the office with older files kept in her father's home, and whether files were maintained under the name of the property or a workman. Later on, she conceded that there were a lot of records in file cabinets dispersed throughout her parents' home, including in her father's office and the garage, and that it would take a "long, long" time to go through all of them because the records went back 40 years. She clarified, however, that although all the records for the Property were not in one file, the rental agreements for the Property were in a separate file and the tax records for the properties were also segregated.

Upon cross-examination by Llewellyn's counsel, she acknowledged that because she searched only for "antiquated documents," she could not testify whether or not she had produced all documents related to the Property even though she knew that ownership was at issue.

Lesh's parents established the Trust in 2006. About 80 or 90 properties, including the Property, owned by Weiss were placed in the Trust. The grant deed placing the

Property in the Trust lists as grantor Edward Weiss "**aka MARGARET STENSRUDDA**" and Weiss and his wife as trustees of the Trust but was not recorded.

Lesh also testified about the use of the Property. Since its acquisition in 1970, the Property was leased to tenants until it was acquired by Llewellyn. The rental agreements were always written; she identified her father's signature and handwritten notations on the rental agreements.

The first rental agreement was dated August 18, 1970, and is on Weiss's stationery reciting the 1414 Vermont Avenue address; Gloria Starks is listed as the tenant and the agreement contains what purports to be Starks's signature. The next rental agreement of record was dated April 21, 1977. Weiss appears on the agreement as "Landlord" and Mozell and Sharron Mack as "Tenant[s]." In the record is also an option to buy the Property dated October 1, 1976, that listed Weiss as the "Optionor." A June 22, 1982 rental agreement listed Weiss as the owner and landlord. A rental agreement dated March 16, 1987, was signed by Weiss as landlord. This agreement is also accompanied by an option to buy and Weiss again appeared as the "OPTIONOR." The last rental agreement of record was dated September 5, 2008. Weiss appeared as owner and landlord. Lesh testified that the tenants remained on the Property until 2011. There was no mention of Stensrudda on any of these rental agreements.[6]

Los Angeles County issued a tax bill on the Property to Stensrudda and the Property was insured under that name. Although at trial Lesh proffered only a few documents evidencing her payment of property tax bills in the early 1980's and in 2011 and 2012, she testified that the property taxes were never delinquent and that her father paid the property tax bills. She knew this because she "help[ed] organize the tax bills" and made "sure that everything was added together and whatever else needed to be done to pay the taxes." She also testified that she has been paying the property tax bills even

---

[6] While it is not clear whether these five rental agreements cover the entire period from 1970 to 2011, the roughly 20-year break between the fourth and fifth rental agreements may be explained by Lesh's testimony that one of the tenants remained in the Property for 21 years.

7

after Llewellyn purchased the Property in 2011. There was no testimony that anyone other than Weiss or Lesh paid the property tax bills.

She further testified that Weiss or she and "no one" else paid the fire and liability insurance on the Property and that paying those bills was part of her "job responsibility." The insurance company never returned her check for payment of insurance on the Property, and "we paid the insurance every single year on the Property." Also in the record were repair bills for the Property from 1972, 1974, and 1983 addressed to Weiss.

Lesh became aware of "Margaret Stensrudda" when in the late 1970's or early 1980's, she was paying the insurance for the first time on the Weiss properties. She testified that when she saw Stensrudda's name, she concluded that something was "definitely wrong because we only exclusively take care of our own property." She further testified that when she saw Stensrudda's name, she thought that she needed to talk with her father because she questioned why her family would be "paying for insurance or taxes or anything else for this person." She explained that she was curious if Stensrudda was a "long lost" sister because her father did not talk much about his side of the family.

After seeing Stensrudda's name on the bill, Lesh "immediately" spoke with her father and asked about Margaret Stensrudda. Over Llewellyn's hearsay objection, the court provisionally permitted Lesh to testify about her father's response.

She testified that Weiss told her he had made up the name "Stensrudda" to buy the Property at a better price at probate "because he was getting bid-up on many different properties" and when people saw his name, they became more interested in the Property because he was known to identify "'good deal[s].'" "He wasn't proud of what he did. He wasn't happy about what he did. He said it was the wrong thing to do. He said he received a commission that he shouldn't have received, and it wasn't worth it."

Lesh testified that she spoke with her father more than once about Margaret Stensrudda and his explanation of why the Property was in Stensrudda's name did not change over time. She added that "this" was dinner conversation at the family table many times, and that her father had told her he had done the same thing when he had purchased a different property in the name of "Marianna Christmas." Upon counsel for

8

Llewellyn's cross-examination, Lesh answered affirmatively to counsel's inquiry as to whether her father had used a fake name to purchase other properties under "circumstances similar to the ones found here." Wilton did not testify even though plaintiffs' counsel was her husband.

Eventually, the court ruled that Weiss's statements to Lesh about Stensrudda were inadmissible under the hearsay exception for family history in Evidence Code section 1310 and considered the statements for the limited purpose of demonstrating that Stensrudda was not a member of the Weiss family.

Lesh also testified that no one outside the Weiss family knew that Weiss was Stensrudda. Lesh admitted that she was aware of the fact that title to the Property was listed in Stensrudda's name, and that neither she nor her sister took steps after their father's death to change the title to reflect Weiss's ownership.

With respect to Llewellyn, Lesh testified that the first indication of trouble was after the tenant had vacated the Property in 2011 when she "sent someone over to get . . . a painting estimate" "on work." That person called her to inform her that somebody else was doing "'rehab work'" on the Property. She recalls being "frantic" and trying to get contact information from the person at the job site so as to "find out who the owner of the Property was so that I could contact them immediately to have them stop work."

She recounted that in the first week of July 2011 she spoke with Wells and informed him that "we were the owner of the Property" for "40-plus years," told him to stop work and to consult his title insurance company, and that she was going to refer the matter to her attorney. When she did not hear from Wells, she caused a trespass notice to be posted on the Property. She later found out that the Property was up for sale in 2012, and she contacted the brokers to tell them not to sell the Property because there was an issue with title. She never obtained possession of the Property after that and has not been paid rent since July 2011. She stated that she learned about Nichols only after the lawsuit was filed.

Upon redirect, she testified that during the time period starting in the 1970's until her mother passed away in 2009, she was never aware that any properties owned by her parents "were taken by way of a forged deed."

**Evidence regarding Llewellyn's claim to the Property**

Llewellyn is a California limited liability company. Nichols testified that he is an investor in real estate and rehabilitates or "flip[s]" houses. He described his investment strategy: "[Y]ou buy a property that is under valued because of its condition below the comps, and then I invest money into rehabilitating it so that it can be sold at the—at the top value comps." This was his intent with respect to the Property.

Nichols found the Property through Wells. Wells had learned about the Property from Juan Michael (Michael). Nichols also spoke with Michael about the Property; Michael was a finder of properties for investors. The total amount of the finder's fee that Nichols agreed to pay was $18,000. Michael received a $6,000 finder's fee and "Simple Strategies" received $12,000. Nichols did not know what Simple Strategies was but thought it was "[j]ust another finder." Nichols did not know whether Michael was representing the seller.

The Property came to Nichols as "pre-packaged deal" from a wholesaler, that is, it was offered at $115,000, take it or leave it. Nichols never looked at the Property before he signed the purchase agreement.[7] Nichols did pay $115,000 for the Property. Wells testified that he estimated the Property's market value after renovation to be between $230,000 and $240,000.

Nichols stated that he obtained a loan through former defendant, Anchor Loans, Inc., which he personally guaranteed. He converted the Property from a two bedroom, one bath to a three bedroom, two baths house. Nichols's company, Invictus, lent Llewellyn approximately $35,000 to renovate the Property. Nichols also testified that he

---

[7] Nichols's testimony was not entirely clear in this regard. Upon cross-examination by his counsel, Nichols testified that he first saw the Property "within a day or two of talking to Darren" Wells.

was losing money every month on the Property because of the Anchor loan and his inability to rent the Property.

He stated that he was not present when the signature from Margaret Stensrudda "appeared" on the purchase agreement for the Property. No broker for Stensrudda was listed on the agreement either; the space for identifying the seller's broker was blank. Although the broker listed on the agreement was someone named Mack, Mack did not find the Property for Nichols. Nichols, however, had met Mack before but not in connection with the Property.

According to Nichols, no one seemed to be representing the seller in the transaction. When asked whether he thought that was odd, Nichols answered: "I assumed it was [Michael] and Simple Strategies that had a deal together, but, yeah." When asked if anyone in the entire transaction had indicated that they had communicated with Margaret Stensrudda, Nichols replied: "Well, I know that [Michael] said he was getting the sellers to sign it. That's what I know. I didn't know if they had an official meeting." Neither Wells nor Nichols ever spoke with or met with a person named Stensrudda. Nichols explained that Michael told him that "he was getting the sellers to sign it." Michael did not testify at trial.

When asked to confirm that he was aware of "a problem with the acquisition" at the time he borrowed the money from Invictus to renovate the Property, Nichols said that he was not aware of a problem "because I had done my research, and there was no Ms. Stensrudda and there was no contact."

Oviedo testified that he was a notary working for the Los Angeles County Superior Court and that the signature purporting to notarize Llewellyn's grant deed was not his; the stamp, however, was his. He further testified that he was always in possession of his stamp and never "authorized" anyone to use it. He did not notarize Llewellyn's grant deed and there was no entry in his notary journal that reflected this notarization. Oviedo never heard of Margaret Stensrudda.

In response to the court's question as to what was "the defense's theory as to who Ms. Stensrudda is," Anchor's defense counsel conceded that he could not say who she "is

11

specifically." He then stated: "[W]e don't have a proffer as to who she was. We felt that it is the plaintiff's burden to show that she didn't exist." Llewellyn's counsel conceded that "we don't know whether or not Ms. Stensrudda herself existed." Nichols also testified that he had no documentation or evidence to refute that "Margaret Stensrudda" was a name made up by Weiss.

Wells testified as to his bringing the deal to Nichols. He never went inside the Property when he first spoke with Nichols although he was aware that it was occupied. He said that he contacted Michael to make sure that the Property was going to be vacant prior to the close of escrow. He also testified that after seeing the notice that Lesh identified in her testimony, he told Nichols that "we are going to continue working." After talking with Nichols, work stopped on the Property for awhile. He conceded that he never spoke with Stensrudda and was not aware that "anybody in this transaction" had done so, although he had seen her name when he conducted a title search. He further testified that between the time he first spoke with Lesh and stopping work on the Property, "we thought maybe this could be a fraudulent deal" based on a conversation he had with someone from escrow. At that time approximately $25,000 had been spent on renovating the Property.

**The statement of decision**

The trial court first overruled all of plaintiffs' objections to the proposed statement of decision because plaintiffs failed to specify what relevant evidence the court omitted and "to appreciate that it was plaintiff which had the burden of proof on all issues . . . and the Court . . . found plaintiff's evidence wholly unpersuasive."[8]

---

[8] Included among plaintiffs' objections were: (1) the court did not consider that defendants admitted that Stensrudda had not participated in the 2011 transaction and that the Llewellyn deed of trust was a forgery; (2) there was no evidence that anyone other than Weiss or the Trust had paid the property taxes and the trial court's proposed finding that it was "'likely Stensrudda'" paid them had no evidentiary support; (3) there was no evidentiary support for the court's speculation that Weiss was a lender when he paid $10,885 into the Property's escrow account in 1970; (4) the court misunderstood plaintiffs' legal argument when it employed the pretrial stipulation regarding Stensrudda's not being an "aka" for Weiss to prevent plaintiffs from using the unrecorded

12

The court identified as the initial question whether plaintiffs had standing to bring the lawsuit. The court opined that the answer to this question was "highly dependent on the testimony and credibility of Lesh who was the only witness for the Trust on this issue." The court found that Lesh's claim that the Property was owned by the Trust was primarily based on "a handful of contradictory documents many decades old" and uncorroborated hearsay from Weiss who had shown himself to be "historically untrustworthy," having lied to a notary, an escrow officer, and a judge. To credit Lesh's version of the events, the court observed it "would have to ignore her education, training, licensing and extensive experience in real estate and property management."

The court then noted that it had "provisionally" allowed Lesh to testify about her conversations with Weiss about Stensrudda, but found that the evidence was not admissible under the family history exception to the hearsay rule in Evidence Code section 1310. The court admitted the evidence for the limited purpose of establishing that Stensrudda was not a member of the Weiss family. The trial court added that it did not believe that the conversations ever happened because "[t]he entire story bordered on the preposterous," given that not a single other family member testified to corroborate Lesh's testimony.

The trial court further found that plaintiffs' documentary evidence did not alter the latter conclusion. The court found that the "publicly filed documents actually support a conclusion that Stensrudda was a real person who bought [the Property] in 1970." The court cited to the documentation of the 1970 purchase of the Property that showed Stensrudda to be the buyer. Specifically, the public records demonstrated that the probate court, the attorney for the Estate of Kaumeyer, the notary, the bank, and a title company "believed that Margaret Katrina Stensrudda existed." The court further observed that no public document called Stensrudda's existence into question and that no "independent witness testified that Stensrudda was not a real person."

deed transferring the Property to the Trust to support their claim of ownership; and (5) there was no evidence linking Weiss's fraud in 1970 to the forged deed by which Llewellyn took title to the Property.

The court did not find the "few bills, checks and rental records" to be persuasive and gave the payment of taxes on one occasion 30 years ago little weight. "The absence of other property tax records is another telling admission that someone other than the Trust or its trustees paid the rest of those bills." The court called plaintiffs' two bills and one payment for insurance "slim evidence as to the non-existence of Stensrudda."

The court gave "no weight" to the rental agreements on the issues whether Stensrudda existed and on the ownership of the Property. Besides that the rental agreements were "pre-printed," the court explained its reasoning: "Lesh admitted that she had last visited the property when she was a 'little girl.' In other words, she has no percipient information about who really owned or lived in the . . . property over the last 40 years, including whether it was Stensrudda." The court made no mention of the exhibits regarding Weiss's or the Trust's payment of repair bills for the Property.

Finally, the court stated that the exhibits showing Weiss's payment out of his personal funds of the bulk of the purchase price into the Property's escrow account in 1970 was not "inconsistent with Weiss acting as a lender in the purchase."

Based on the foregoing, the court concluded that the Trust had no claim to the ownership of the Property and thus no standing to bring the claims in the FAC.

The second issue the trial court discussed was whether plaintiffs were entitled to seek equitable remedies at all because of Weiss's and Lesh's fraud. The court found that Weiss and Lesh had unclean hands because for 40 years, they had fraudulently misrepresented ownership of the Property in the public record and to "multiple individuals." The court also faulted Lesh for doing "nothing for many years to rectify the situation, that is until her brother-in-law filed this action." The court further found that even if Lesh's "story about her father is true," her "cover[ing] up the original fraud" "prejudice[d] . . . others, including Llewellyn, who relied on the public records." The court then quoted Civil Code section 3543: "'Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer.'" The court did not discuss the forged deed or the evidence on which the court relied to arrive at these conclusions.

14

Finally, the trial court found that Llewellyn did not have unclean hands because he was entitled to rely on the public records, including the grant deed in Stensrudda's name, it was not improper for him to flip property for a profit because that was "capitalism," and nothing in the purchase price "suggests some nefarious conduct by Llewellyn."

## DISCUSSION

**Substantial evidence did not support the trial court's finding that plaintiffs did not own the land and lacked standing**

### *The applicable standard of review*

Plaintiffs, Anchor, and Llewellyn agree that the applicable standard of review is whether the trial court's findings were supported by substantial evidence. Under that standard of review, our power "*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support" the trial court's findings. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.) We cannot substitute our own deductions from the evidence (*id*. at p. 874), and we must resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308). At the same time, "if the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644.)

### *Plaintiffs made a prima facie case of ownership under rebuttable presumptions of ownership based on plaintiffs' uncontradicted possession and control of the Property*

"The things which a person possesses are presumed to be owned by him." (Evid. Code, § 637.) "A person who exercises acts of ownership over property is presumed to

15

be the owner of it." (Evid. Code, § 638.) "These provisions[9] are in accord with the settled law everywhere, and while such presumptions are disputable and may be controverted by other evidence, they afford full and sufficient evidence of ownership of land unless controverted [citation]. As against an entire stranger to the title, actual possession of land has uniformly been held, both in ejectment and actions to quiet title, to make out a *prima facie* case, sufficient to sustain a conclusion of ownership." (*Davis v. Crump* (1912) 162 Cal. 513, 518.)

The presumptions set forth in Evidence Code sections 637 and 638 are presumptions established by law affecting the burden of producing evidence. (Evid. Code, § 630.) "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (Evid. Code, § 604.)

We are mindful of our duty not to reweigh evidence and to make all inferences in support of the trial court's findings. On the other hand, we are not a rubber-stamp, and where, as here, the trial court engaged in speculation in not crediting or in ignoring uncontested evidence supporting Weiss's and the Trust's possession and control of the Property, we are not obligated to affirm the resulting findings.

In evidence were decades of agreements renting out the Property in the name of Weiss or the Trust as landlord; indeed, some agreements provided an option to buy the Property with Weiss listed as the grantor of the option. The trial court gave them "no weight." Lesh testified at length about these agreements. Defendants did not proffer any other rental agreements at trial. Lesh's testimony on Weiss's or the Trust's possession of the Property was uncontradicted at trial. Defendants produced no evidence that anyone

---

**9** The reference is to the predecessor provisions of Evidence Code sections 637 and 638.

16

else, let alone Stensrudda, entered into agreements with tenants to rent the Property or otherwise controlled its use.

The trial court dismissed Lesh's testimony on the basis that Lesh was a "little girl" the last time she visited the Property and thus had no "percipient knowledge" about who lived in the Property. The court dismissed the rental agreements themselves as "preprinted." First, not all the rental agreements were on preprinted forms; at least one was typed as a letter on Weiss's office stationery. As noted above, the address on that letter was the same one that appeared on the escrow statement "c/o Weiss."

The trial court ignored Lesh's uncontradicted testimony that since she was 16, she became involved in managing her parents' properties and soon thereafter became the manager for the properties, including the Property at issue here. Again, there was no evidence that anyone other than Lesh managed the Property, which management responsibilities included becoming familiar with the rental agreements, renting out the Property, and paying the Property's expenses. There certainly was no evidence that someone named Stensrudda managed the Property, or rented, occupied, or otherwise possessed or controlled the Property.[10]

The trial court's logic was also internally inconsistent. The major theme of the trial court's decision was that based on Lesh's experience in managing real estate and as a broker, she should have known better than being complicit in her father's fraud. She gained that experience, however, by managing her parents' and then the family Trust's properties, but the trial court ignored that very experience in dismissing her familiarity with the use of the Property as that of a "little girl."

The trial court merely speculates in finding that Weiss's substantial payment ($10,885) toward the $12,000 purchase price for the Property in 1970 was not

---

[10] As set forth *ante*, the trial court found that the public records demonstrated that the probate court, the attorney for the Estate of Kaumeyer, the notary, the bank, and a title company "believed that Margaret Katrina Stensrudda existed." There was no witness from the bank, the seller's estate, the escrow company, or the notary to support the court's finding as to these persons' beliefs.

17

"inconsistent with Weiss acting as a lender in the purchase." The evidence that Weiss had made this payment toward the purchase of the Property was uncontracticted. In contrast, there was no evidence to support an inference, let alone a finding, that he did so as a mere lender.

There was similarly no evidence at trial that anyone other than Weiss or the Trust paid the taxes on the Property. Again, Lesh testified extensively about her role as manager in paying the property taxes on Trust properties and that the taxes on the Property were never delinquent. There was no evidence that Stensrudda, or anyone other than Weiss or the Trust paid the taxes. The fact that Lesh brought to court only a few tax bills does not alter the complete absence of evidence to support that anyone other than Weiss or the Trust paid these expenses and possessed the Property. The same is true for Lesh's uncontradicted testimony that Weiss or the Trust paid the insurance for the Property. The trial court, moreover, made no mention of the repair bills for the Property in evidence addressed to Weiss, which too demonstrated possession and control of the Property. Again, there was no evidence that anyone other than Weiss or the Trust paid repair expenses for the Property.

For all these reasons, plaintiffs were entitled to the benefit of the rebuttable presumptions of ownership under Evidence Code sections 637 and 638, and the burden of coming forward with evidence that Stensrudda was a real person shifted to defendants.

Llewellyn argues that the Trust waived the benefit of the presumption of ownership under Evidence Code sections 637 and 638 by not raising that "argument" in the trial court. We find Llewellyn's argument curious. Failing to inform the trial court of applicable legal authority is not waiver of an argument. It is all counsels' obligation to inform the trial court of the relevant law, and not to lie in wait on appeal. We have discretion in the interests of justice to consider points not raised below, and have exercised our discretion to do so here.[11]

---

[11] "There are many situations where appellate courts will consider such matters [issues raised for the first time on appeal]. They will often be considered where the issue relates to questions of law only. (*Tyre* v. *Aetna Life Ins. Co.*, 54 Cal.2d 399, 405; *Jones*

18

Second, as set forth above, the presumptions here mattered.  At trial, the court inquired into defendants' "theory" as to who was Stensrudda.  Anchor's counsel responded that he did not need one because it was "plaintiff's burden to show that she didn't exist."  Llewellyn's response was more forthcoming:  "[W]e don't know whether or not Ms. Stensrudda herself existed."  Nor did defendants proffer the testimony of Michael, the only witness who Nichols and Wells testified had contact with "the seller."  **The court's finding that equitable relief is not available to plaintiffs because of Weiss's misrepresentations in 1970 and Lesh's failure to correct those misrepresentations is not supported by substantial evidence because defendants' respective claims to title were obtained through a forged deed and there was no evidence that Weiss's fraud caused the forgery**

"There is no question but what the forged deed is absolutely void, and even in the case of a person claiming in good faith thereunder, is inoperative, either to divest the purported grantor's title or to vest any right or title in the grantee or claimant."  (*Gioscio v. Lautenschlager* (1937) 23 Cal.App.2d 616, 619.)  The statement of decision makes no mention of this law.

Llewellyn cites Civil Code section 3543, providing "[w]here one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer," and argues that Weiss's fraud and Lesh's failure to remedy the fraud estops plaintiffs from seeking equitable relief here.  Llewellyn relies on *Crittenden v. McCoud* (1951) 106 Cal.App.2d 42 (*Crittenden*) and *Merry v. Garibaldi* (1941) 48 Cal.App.2d 397 (*Merry*) to support its estoppel defense.  The problem with Llewellyn's arguments is

v. *Fireman's Fund Ins. Co.*, 270 Cal.App.2d 779, 783-784.)  Appellate courts are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved.  (*People* v. *Rodriguez*, 58 Cal.App.2d 415, 421.)  Whether the rule shall be applied is largely a question of the appellate court's discretion.  (*Isthmian Lines, Inc.* v. *Schirmer Stevedoring Co.*, 255 Cal.App.2d 607, 610.)"  (*Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 5.)  The rule requiring the matter to have been raised in the trial court "does not apply to matters involving the public interest or the due administration of justice, e.g., illegality or unclean hands. [Citations.]"  (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 406, p. 465.)

19

that they hinge on a causation theory for which there was no evidence at trial, to wit, that Weiss's fraud in 1970 and Lesh's failure to correct the public record made the forgery possible, thus causing Llewellyn harm.[12]

In *Crittenden*, the plaintiff lawyer claimed title through a deed that he knew to have been forged, indeed as to which forgery he was an active participant. More specifically, he impersonated his client (who was then incarcerated and had told his wife to get rid of real property) in obtaining notarization of a deed of trust transferring full title to real property to the client's wife. Later on, the wife sold the property to the defendant. The client, then out of prison, was with his wife when she cashed defendant's check for payment of the Property and immediately purchased a new property. At no time did the client disclose to the defendant that defendant's deed was forged, although the client knew his signature had been forged at the time he and his wife cashed the defendant's check and had purchased a new property. Subsequently, the client conveyed a half interest in the property to his lawyer, who sought to quiet title against the defendant. Under these facts, the appellate court found that the plaintiff attorney was estopped from denying the validity of the forged deed. (C*rittenden*, *supra*, 106 Cal.App.2d at pp. 48–50.)

In *Merry*, the plaintiff sought to cancel a promissory note and deed of trust securing that note even though she knew that her son-in-law had forged her name on those documents and she had not informed the defendant lenders of the forgery when she found out about the forgery. The loan eventually became delinquent. The appellate court held that the plaintiff was estopped from asserting that the deed of trust securing the loan was a forgery. (*Merry*, *supra*, 48 Cal.App.2d at pp. 402–403.)

Llewellyn's harm derived from the forgery because he could not obtain good title from the forged deed. Unlike in *Crittenden* and *Merry*, which applied estoppel principles to avoid the harsh results of that general rule, there was no evidence before the trial court

---

[12] Anchor concedes that the law of unclean hands "requires that the conduct complained of *harm the defendants*[.]"

20

how the forgery happened, let alone evidence that Weiss or Lesh knew that Llewellyn's deed was forged.  There was no evidence that Weiss's putting the deed of trust in Stensrudda's name in 1970 or Lesh's failure to correct that false deed in any way enabled or caused the forgery.  There was no evidence to invoke Civil Code section 3543 because there was no evidence that Weiss's or Lesh's conduct caused the forgery to "happen."[13]

Anchor's lawyer appears to have conceded this failure of proof when he argues that "[b]ecause this argument was not presented below, no evidence was present on the part of the Appellant to support his view, and similarly, *no evidence was presented by the Respondents to counter it.*"  (Italics added.)  Anchor merely argues without evidentiary support that "it stands to reason that the Property being held in the name of . . . a non-existent pseudonym would make it exponentially more likely to commit the kind of fraud alleged to have been committed here:  a forgery of the deed conveying title to Llewellyn."[14]

Anchor's arguments are somewhat disingenuous.  Plaintiffs vigorously objected to the trial court's proposed statement of decision because, among other grounds, the court did not consider that Llewellyn's deed was a forgery and that there was no evidence linking Weiss's fraud to that forgery.  (See *ante*, fn. 8.)

---

[13] To the extent negligence was an issue, one could argue that the evidence supports Llewellyn's negligence in purchasing property knowing that there was no one representing the seller in the transaction, which Nichols described as unusual, and the only one he and Wells understood interfaced with the seller was Michael, whom the defendants did not proffer as a witness at trial.  The trial court found it "extremely telling" that other Weiss family members did not testify about Weiss's disclosures that Stensrudda was not a real person, but arguably far more telling was the absence of Michael as a witness for defendants.

[14] Anchor faults Lesh for choosing to bring suit instead of "contact[ing] [counsel] to determine if there was a legal remedy to fix the title issue[.]"  Anchor suggests that Code of Civil Procedure sections 770.020 and 770.050 would have provided such a remedy.  (We note that Anchor incorrectly cited these sections as appearing in the Civil Code.)  Anchor, however, does not explain why it could not have employed that same remedy, and there is nothing in the record indicating that it has yet done so.

Anchor argues for the first time on appeal that it had to defend this case because the "real Margaret Stensrudda" could sue them for the same claims. We have difficulty understanding this argument because defendants' title problems stem from the forged deed as to which there was no evidence that Weiss played any role.

## DISPOSITION

The judgment is reversed. The case is remanded with directions to cancel the grant deed recorded on May 6, 2011, conveying the Property to Llewellyn Properties LLC and the assignment of deed of trust recorded on May 27, 2011; order defendants to deliver possession of the Property to plaintiffs; declare that plaintiffs have a fee simple interest in the property; and try the parties' competing claims for monetary relief, that is, plaintiffs' claims for money damages and defendants' offset defenses. Appellants are to recover their costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.


---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.